Case number 24-3933 William Shelton v. CMHA et al. Argument is not to exceed 15 minutes per side. Mr. Mays, you may proceed for the appellant. Good morning, your honors. My name is Lawrence Mays. I'm here representing William Shelton, the appellant in this case. I know that there are a number of issues before the court that have been appealed. I intend to focus, however, on the issue of accrual and timeliness of the complaint being filed. And the issues in the district court's opinion wherein she denied counts one through four and specifically counts pertaining to Mr. Shelton's race discrimination and retaliation under Title VII. William Shelton had been an employee of CMHA, the appellant, since at least 2016. He was a patrol officer. And as a patrol officer, he had an excellent employment record. He endured the loss of his sister sometime in 2017. After that, he began, as a form of coping, to record, rap music, and ultimately rap videos. He used the moniker TB in honor of his sister. Over time, while working at CMHA as a patrol officer, the appellant shared his music with, among others, his supervisor, his coworkers, and even the chief of police, Chief Gonzales. Some of his officers actually purchased the rap videos and the rap music. Sergeant Smitty, the record reflects, actually encouraged Mr. Shelton to continue with his music. The chief of police, Chief Gonzales, learned that Mr. Shelton was a rap artist and invited Mr. Shelton to perform at a CMHA event. At the time, Mr. Shelton informed the chief that he could not do that because of the lyrics in the videos. Pardon me if I'm mistaken, but I thought that many of the claims were dismissed because of lack of timeliness. Yes. So is that where you're going with this? Yes, Your Honor. I can address it quickly. We believe that the district court erred in relying upon, I believe it's Regula versus Russ. She cited that opinion to reflect the appropriate test for statute of limitations, and it was wrong. She did not in any way refer to the appropriate Sixth Circuit test either from Bishop, either from Schneider versus Ohio State University. Instead, she read into Regula almost an occurrence rule and charged Mr. Shelton with having learned about the claim of a First Amendment when he filed a charge of employment discrimination with the EEOC. Mr. Shelton was terminated in January of 21. He ultimately, almost a month later, filed a charge of employment discrimination with the EEOC. So he filed, again, correct me if I'm wrong, but he filed his EEOC claim in February of 21.  And he claimed that he was discriminated against, right? He did. He claimed that he was discriminated against for filing an internal harassment complaint. And he referenced in his charge that there were other individuals who were not treated as he was. But the essence of his claim is that he was terminated wrongfully based on discrimination. That's the essence. And when he was terminated, was he given reasons for his termination? I appreciate that question, Your Honor. He was presented with a termination letter. And the termination letter, at the very bottom, referenced five videos that were considered to be violations of CMHA policy. Those five videos, we agree, were, in some respects, contained lyrics that could be construed as vulgar, potentially offensive to women. However, in that termination letter, CMHA referenced that because of other testimonial evidence and documentary evidence, he was ultimately terminated for those five videos. Mr. Sheldon has never seen what the other evidence was that's referenced in that termination letter. But for purposes of the statute of limitations, I'm not sure why he didn't have enough information when he filed the EEOC complaint in February to trigger the running of the statute of limitations. And he filed his claim in federal court a month beyond the February 23 date in March of 23. He didn't have it because it wasn't shared with him. I'm indicating that in his termination letter, the specifics of what the appellee CMHA undertook to get a First Amendment assessment, not just of the five videos, but of all Mr. Sheldon's videos. But why did he need to know that in order to file a federal district court case? Because in that termination letter, Your Honor, Mr. Sheldon only read that he was being cited and charged with violations of policies and regulations of CMHA and the police department. They kept reiterating to him that you're being charged with a violation of policy. You've been charged with a violation of a regulation. At no time was the information about First Amendment assessment by an outside law firm referenced or shared with Mr. Sheldon. So when did he find out about the outside law firm? He found out about it at his arbitration in March of 2022. And that raises a question that I had. The result of the arbitration was to reinstate him, am I correct? Yes, Your Honor. And did he get back pay as a result of the arbitration? He did. We contended during the litigation that he didn't get what he thought he should be entitled to. But ultimately, CMHA was persuasive in saying he was entitled to a certain specific amount, which they calculated, we believe now, correctly. So how does the arbitration impact the litigation, if at all? It impacts the litigation because it was taken before a court reporter, was sworn testimony by all of the individuals involved. At the arbitration was where Betsy McCafferty, the then Human Resources Director, first disclosed that there had been a First Amendment assessment of all of his videos. Later at the same arbitration, Chief Gonzales also indicated and revealed there was a First Amendment assessment of all his videos, and that they ultimately concluded that Mr. Shelton could only be charged with the five videos that they considered violative of their policies. But the letter of termination referred to those five videos, right? It did. So wouldn't that have told them that there was something in those videos that violated the regulations? They were considered to be gross misconduct by Mr. Shelton, the appellant, because of the depiction and conduct of Mr. Shelton in those videos. The videos did not include Mr. Shelton in uniform. They did not include references to CMHA. They were straight artistic recordings of the rap gangster genre in these videos. And they were cited as violations of the CMHA policy. Well, what's the date upon which the statute of limitations began to run? In Ohio, the statute of limitations, I believe, was one year, Your Honor. Yes, but when did the one year commence? What was the date of commencement? We argue that the date of accrual of that statute is when he learned, sitting in the arbitration and listening to the human resources director, Betsy McCaffrey, and the chief of police, Andres Gonzalez, say that they had secured an outside legal counsel to assess all of Mr. Shelton's videos and concluded that the five were in violation of various regulations of CMHA. So is it the date, then, that the outside legal counsel made its report to CMHA? Is that the particular date? No, Your Honor, it is not. The particular date is when did Shelton learn, for the first time, that there had been a First Amendment assessment of his five videos, all of his videos. He had approximately, at that point in time, about 14 videos. So a problem that might occur, I suppose, is if there hadn't been an arbitration, how would your client have known about this outside study that the CMHA had undertaken? We argue and believe he would not have known. So the statute of limitations would never start to run, then? Absolutely. He would have no way of knowing what the elements are. The district court judge appears to make the connection between his charge of employment discrimination on race and retaliation, the date of which is sometime in February, or perhaps when he was terminated. This charge of counts one through four are constitutional injuries, and the law in this circuit says you count when you know of both the injury and its cause. And we're arguing, Your Honors, that without the disclosures and the testimony of Ms. McCafferty and Mr. Gonzalez at the arbitration, he would not have known, possibly ever. What's the injury? Is it the firing, or is it the fact that they conducted the investigation? The injury is the termination. So he knew, of course, that he was terminated when he was terminated. We concede that much, yes. Your red light is on, so if you wish to save your rebuttal, that's fine, or if you wish to continue. I will do my best. Thank you, Your Honors. Good morning. May it please the Court. I am Aretta Bernard, and with me here today is CMHA's Chief General Counsel, Mr. Terry Billups. I represent CMHA and Lieutenant Drew in this matter. We believe that the record unequivocally supports the trial court's granting, in part, of the motion for partial judgment on the pleadings and disposing of the remainder of this case on summary judgment. It bears noting that, as referenced by Mr. Mays, the only claims that have been briefed before this Court are the counts one through four, the constitutional claims, and the Title VII claim, but solely as it relates to CMHA only. In this matter, the Court accurately applied this Court's decision in Reguli and concluded that the constitutional claims in counts one through four, as alleged by plaintiff, were time-barred. As noted by the lower court and as mentioned today by this Court in the argument before me, the plaintiff appellant was fully aware when he received a very detailed termination letter delivered to him on January 29th of 2021, that he was being terminated because of, and it says in the letter, specifically because you posted a series of videos of yourself on YouTube which contained certain lyrics and depictions of violence, and lyrics that are derogatory and offensive to women and promote violence against women, including but not limited to, and it listed each of the five offending videos that form the basis for the termination. This letter conclusively states that you're being terminated, i.e., the adverse action that is resulting, and the cause of that adverse action is that these videos and the content of them violates numerous listed policies and procedures in place to which then-officer Shelton was obligated to comply. So do you contend that the statute of limitations began to run on the day of termination? Yes. Or why not say it began to run on the day that he filed an EEOC complaint? Because the injury occurred on the 29th, and the cause of the injury was known to him on that date. So for all purposes, no matter what rule is used to analyze, all paths lead back to that date as the date of his knowledge that if he was going to pursue any claims, and the basis for them are laid out in the termination letter, he knew that as of January 29, 2021. With regard to the separate filing of a charge, I think the judge referenced that, Your Honor, because as she was saying, in any event, when he filed that charge, to the extent he's making a First Amendment retaliation claim based on the submission of a charge, he certainly knew that when he made the charge in the EEOC. So he had filed an internal complaint just called workplace harassment, not even race harassment, but he had hand-delivered that at 3.30 on September 18th of 2020. And so when he filed his charge after his termination, to the extent he was trying to relate the submission of that charge back in September of 2020 to his termination, he certainly did that at the time, he knew that at the time he filed his EEOC charge. So I think that the judge referenced it with regard to the separate claim that you can make a claim, if you've made a complaint of discrimination in the workplace as a public employee, you can attempt to state a claim for First Amendment retaliation, but you have to do it within the statute of limitations, which was not done in this case. So she was making that point. So the internal complaint was complaining of race-based discrimination? Yes, he had made like 24 allegations that were various things that he thought were somehow race-related. There was a separate law firm that came in and investigated that and found 23 unsubstantiated. There was one that they couldn't say happened or didn't happen. But that didn't relate to anything that's been alleged in this lawsuit. Okay. So if, hypothetically, the termination letter had not referred to the videos, would there be an issue about how he would know that there was a First Amendment aspect to his termination until the discovery was happening in the arbitration proceeding? No, because he knew he was terminated on January 20th. But in my hypo, he didn't, in the hypo, he didn't know that the videos were the cause of his termination. Well, it's hard for me to answer the hypothetical because the events actually leading up and that are in the record in this case is that even before they undertook a pre-disciplinary conference with Officer Shelton, they had an informational meeting with him in January of 2021. At that meeting, he was represented by his union representative, and the union representative brought up the constitutional and Officer Shelton brought up his rights with regard to the content of his gangster rap videos. So even before he was terminated, he was using, referencing the Constitution, his First Amendment rights under the Constitution during those conversations that he himself recorded clandestinely, and then we obtained in discovery in this case. So I could conceivably argue that he knew what the issues were, why he had been placed on leave as of that date of that meeting that he recorded, where he himself referenced his rights in relation to the Constitution. Did that meeting take place before or after the lawyer review of the tapes? I believe it took, I don't know, because the lawyer review of the tapes is privileged and was never produced to them, and that's never been appealed or sought further in this case. So as I stand here, I don't know when that was done, Your Honor. I apologize, but I do know this. Before he was terminated, he was clearly aware of his constitutional rights, clearly aware that he was being investigated for the content and substance of those videos, and if he wasn't clear on that point, it was certainly made clear to him in his termination letter. So I apologize, Judge Moore, if I haven't answered your question, but I think that's relevant to understanding that the hypothetical here really wouldn't apply, based on the record before the court. Counsel, you know, your opposing counsel seems to suggest that the employer knew about the videos and, I wouldn't say approved, but acquiesced in the plaintiff making these videos. Is the issue whether, number one, did the employer know and was it that the employer knew about videos or is there a distinction between knowing about the videos being made and knowing the actual content of the videos with all this misogynistic content and bad things that were in the videos? Maybe you can enlighten us about that. Sure. I think what the record establishes on that point, Your Honor, is that the chief of police was aware that he was into music and that that was his way of kind of his hobby, if you will. The chief had no idea what the content of those videos were, had never seen them, and never saw anything having to do with his gangster rap videos. What caused the issue here is that in early September he released this video called Headshot, and it was particularly offensive and it started circulating within the police department because it depicted a group of African-American gangsters actually assassinating a white homeless gentleman who was actually a real homeless gentleman that Officer Shelton had provided with alcohol in order for him to participate in this video. So all of that came out in early September. It was reported by his supervisor, Sergeant Smitty, to the commanders at CMHAPD. They then reported it to the deputy chief, and this was all prior to Mr. Shelton submitting his workplace harassment complaint on September 18th. And then on the morning of September 18th, the commanders, Bertie Shaw and Drew, were having a meeting, a regularly scheduled briefing with the chief. And at that briefing they asked him if the deputy chief had let him know about the headshot, about the video that's been circulating, and the chief said, no, what video? And then they told him how to access it. They left, and he started watching this video. It was very upsetting to the chief, and he immediately called the chief executive officer at CMHA and reported it to him. Later that afternoon, Shelton delivered his hostile work environment complaint. So these actions were taken without any knowledge. The actions with respect to Officer Shelton's misconduct vis-a-vis those videos was taken before he actually submitted his complaint at 330. And this is all in the declarations unrefuted in the record in this case. So I hope that clarifies that issue. I did want to say that with regard to the remaining, to me it's unequivocal, these claims are time-barred. And all of these arguments are really, in my view, baseless in law. I mean, to argue that your statute doesn't run, as noted by Judge Moore, the statute would never run this case if you don't find out allegedly about legal advice sought by the employer prior to terminating somebody. That is not the law of this court, and it's not the law of this land. So I think that argument should be rejected wholesale by this court. But with regard to the Title VII claims, this record is devoid of any evidence to establish a prima facie case of race discrimination against CMHA. And furthermore, the record clearly does not evidence any form of retaliation. The unequivocal, unrefuted timeline in this case establishes that there was action taken on these videos prior to any submission or knowledge of any submission of any alleged claim of discrimination in the workplace. But the action that was taken was internal. The ultimate action of termination was not taken until after the internal complaint was filed, right? The termination was taken solely as a result of the content of those five videos. That's what he was terminated for. The argument is somehow that they did that because he filed a complaint of discrimination internally at CMHA. My point, Your Honor, is that they had no knowledge of his complaint because they pursued the discipline of him starting before they knew that he had ever filed that complaint. So there's no connection. The ultimate discipline was termination. And what day was that decided upon? So that was on January 29th of 2021. And the sole reason for that termination was, as I stated earlier, the content of the five videos. But his internal complaint was filed in September of the previous year. Correct. And the issues regarding his misconduct surrounding those videos was elevated before he filed that complaint. And that's what the court found below. That's why there's no retaliation claim. But my point is, just time-wise, that you're saying it was elevated. Yes, it was going up the ranks in terms of people being made aware of the video and the content of the video. But no decision had been made to terminate him until January, which is approximately four months after his internal complaint was filed. That is true.  That is true. However, there is no evidence. And, again, these were treated very well by CMHA, actually. They had two parallel tracks going on because of the conflation of these issues. And, of course, filing a complaint doesn't absolve you from your preexisting misconduct, in any event, as a matter of law. But they handled these very well because they handled the complaint he filed. They hired a law firm. They went through each. They interviewed a bunch of people. And then after that was done, then they had proceeded. They actually handled and had that informational meeting with Officer Shelton. I will tell you this. I think the court should know that it's not in the record, but just anecdotally, when Shelton returned to work, and the arbitrator's decision is based on a just cause standard. That's very different from the arguments that have been made in this case and the claims that were asserted. But notwithstanding, when he was brought back, he has actually been promoted to sergeant since. And he is still employed at CMHA. Just anecdotally, I think it's important to note that. And this is now, he also was, he left CMHA and they hired him back. There is no evidence of race discrimination or retaliation in this case. And that's really what I wanted to focus on since we spent more time on the other arguments. Your red light is on. Yes, thank you. Thank you very much for your time. I appreciate it. Thank you. Just briefly, Your Honors. Your opposing counsel says your client is back at work there. Is that true? Yes, it is. He's been promoted to sergeant. Is he still making these videos with the same sort of subject matter as has been reported in this case? Yes, he is. And let me explain. To access his videos, you have to get an approval access from Mr. Shelton. He has control of who has access to his videos. He's not producing as many of them, but some of them, yes, do include the subject video content. Okay. Now, in terms of the law, there has been no effect on internal operations of the district. No one has come forward, nor did they come forward when Mr. Shelton was subject to the review of his videos. Not from the CMHA resident, not from a member of the public, not even from anyone else on the property. The operations have been pursued without incident. I also want to make a point about the reference, apparently, in a predisciplinary conference by Mr. Shelton. Mr. Shelton made no specific reference to First Amendment rights. The only question that he asked in the predisciplinary conference was, what about my rights? He didn't go further than that. In terms of the race discrimination and retaliation issues referenced by counsel, when does the burden shift? Anytime that the moving party in a summary judgment fails to present specific information regarding its attack on the plaintiff's case, they have to submit admissible evidence. There has been none submitted in this case. I give you again the termination letter. In that termination letter, in addition to the five videos, there is a quote which says, pursuant to the facts presented at the PDC and a review of other testimonial and documentary evidence, it has been determined that you violated the above-mentioned policies and manual and procedures and rules and regulations. The other testimonial and documentary evidence referenced in the termination letter has never been presented to Mr. Shelton. Did you request it in discovery? I requested it of the 30B6 witness and the human resources director. And when I made that request, what did we get? Attorney-client privilege. And your red light is on again. So, we must conclude because we have the remaining cases. Your Honor, thank you. Thank you. Thank you. Thank you both for your argument. The case will be submitted and the clerk may call the next case.